1 | NASH & EDGERTON
2 | SAMUEL Y. EDGERTON, III (CA Bar No. 127156)
2615 Pacific Coast Highway, Suite 322
3 | Hermosa Beach, California 90254
Telephone: (310) 937-2066
4 | Facsimile: (310) 937-2064

**RECEIVED**

**JAN 19 2001**

**WEISS, JENSEN
ELLIS & HOWARD**

5 | Attorneys for Claimant
Linda Arana, Executor of the Estate of
6 | her late father, Theodore Lockrem

7 | BEFORE THE

8 | NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

9 |

10 | LINDA ARANA, Executor of the    ) . | NASD Case No.: 00-04488
Estate of her late father,   )
11 | Theodore Lockrem, Deceased    )

12 |           Claimant,    ) | FIRST AMENDED STATEMENT OF
   ) | CLAIM FOR BREACH OF FIDUCIARY
13 |    v.    ) | DUTY; CONVERSION; FRAUD AND
   ) | DECEIT; UNAUTHORIZED TRADING;
14 | PRUCO SECURITIES, CORPORATION, ) | ELDER ABUSE; SELLING AWAY;
a Delaware Corporation,    ) | FAILURE TO SUPERVISE;
15 | PRUDENTIAL SECURITIES, INC., a ) | NEGLIGENCE; AND INJUNCTIVE
Delaware Corporation and GAIL  ) | RELIEF
16 | SPICUZZA, an individual    )
   )
17 |           Respondents.    )

18 | _____

19 |

20 |    Claimant, Linda Arana, the Executor of the Estate of her

21 | late father, Theodore Lockrem ("Lockrem") (collectively referred

22 | to as the "Lockrem Estate"), allege as follows:

23 |                    I.

24 |                THE PARTIES

25 |    1.   Lockrem, formerly of Page, Arizona, passed away on

26 | October 8, 1997.  At the time of his death, he was 72 years old

27 | and going blind.  At the time of his death, he was renting a room

28 | in Princeville, Kauai, at a house owned by respondent Gail

**EXHIBIT "2"**

GS00046

1  Spicuzza ("Spicuzza").

2     2.   Arana is the only surviving family member of Lockrem.

3  She is the Executor of his Last Will and Testament.  She and her

4  husband, along with their two children, live in Las Vegas,

5  Nevada.

6     3.   Pruco Securities Corporation ("Prudential") a wholly

7  owned subsidiary of Prudential Insurance Company of America.  It

8  is a registered broker-dealer and a member firm and of the

9  National Association of Securities Dealers, Inc. ("NASD").  Its

10  principal place of business is in Newark, New Jersey, although it

11  has offices in all 50 states.

12     4.   Prudential Securities, Inc. is a registered broker-

13  dealer and a member firm of the National Association of

14  Securities Dealers, Inc.  Its principal place of business is

15  located in New York, New York.  As a wholly owned subsidiary of

16  Prudential Insurance Company of America, it provided oversight

17  authority over the securities operations of Prudential during

18  this time period.

19     5.   Spicuzza, age 51, is the owner of a bed and breakfast

20  called the "Angel Inn" located in Princeville, Kauai.  Her bed

21  and breakfast is marketed on the Internet as a place run "by

22  angels."  A former nun in the 1970's, Spicuzza left the convent

23  and went into private business.  In 1984, she joined IDS

24  Financial Services and passed the Series Seven exam.  Thereafter,

25  she joined Prudential as an insurance salesperson and registered

26  representative.  At all relevant times hereto, she was an

27  affiliated person of Prudential and employed as an insurance

28

GS00047

1  salesperson and securities registered representative out of

2  Prudential's Honolulu, Hawaii office.

3

4                              II.

5                       NATURE OF THE CASE

6      6.  This action arises from the fraud and deceit of

7  Spicuzza in converting approximately $220,000 from Lockrem and

8  his Estate to her own personal use.

9                             III.

10                    GENERAL ALLEGATIONS

11     7.  In or about December 1996, Lockrem, a retired widower,

12 traveled to Kauai, Hawaii to visit friends and to look into

13 purchasing a retirement condominium there.  During the trip, he

14 met Spicuzza and became romantically interested in her.

15 Spicuzza, a Prudential registered representative, enticed him to

16 liquidate all assets so that she could invest his money with her

17 upon the representation that his money would be invested with

18 Prudential Securities, Inc. and other securities brokerages

19 located in the continental United States.

20     8.  Specifically, Spicuzza promised Lockrem that she would

21 split the profits on any gains made from his securities

22 investments that she would manage.  By her own admission, she

23 represented to him that his money would be invested in stocks and

24 mutual funds.  Thereafter, Lockrem kept a written list of the

25 brokerage firms where Spicuzza had invested his money.

26 Prudential was on that list.

27     9.  At or about the same time, Spicuzza, with a net annual

28

                              -3-                              GS00048

income of less than $20,000, persuaded Lockrem to loan her other monies in exchange for her promise to physically take care of him and allow him to live at her home for the rest of his life.

10. In or about June 1997, in reliance on the promises made above, Lockrem decided not to purchase a condominium. Instead, he decided to sell his home in Page, Arizona and move in with Spicuzza. Thereafter, Lockrem allowed Spicuzza to manage all of his finances.

11. From January 1997, until his death in October 1997, Spicuzza, in violation of Prudential policy, borrowed approximately $110,000 from Lockrem to pay down her mortgage debt and to pay for other personal expenses.

12. In July 1997, Lockrem moved in with Spicuzza at her Kauai home. Spicuzza persuaded Lockrem to open up a joint savings account at the Kauai Federal Credit Union where she also maintained a private checking account.

13. Upon opening the joint savings account, Lockrem deposited $109,751. These monies derived from the sale of Lockrem's Page, Arizona home. With the opening of the joint account, Spicuzza invested Lockrem's money in several newly-opened brokerage accounts at unrelated brokerage firms on the mainland in her name only. In violation of the NASD Rules of Conduct she invested in excess of $70,000 in these brokerage accounts held in her name only. The source of those funds came from Lockrem, through withdrawals made from the joint savings account and by approximately $20,000 in travelers checks purchased with Lockrem's remaining house sale money.

-4-

GS00049

14.   Unbeknownst to Lockrem, Spicuzza did not invest Lockrem's money in bonds and mutual funds.   Instead she invested Lockrem's money in unsuitable, single issue equity securities, covered call options, straight options and naked options.

15.   At all relevant times, Prudential was aware that its registered representative, Spicuzza, was opening outside brokerage accounts in her name to purchase securities.

16.   Prudential failed to inquire as to the source of her investment funds although it Prudential knew or should have known that Spicuzza did not earn anywhere near the amount of income to be trading in excess of $70,000 in multiple securities accounts.

17.   Spicuzza's plan to earn money stemmed from the fact that she earned less than $20,000 a year as reported on her tax returns.   Desperate for money to maintain her lifestyle, she wished to make high returns by trading in speculative securities.

18.   In 1997, Spicuzza enrolled in a Wade Cook investment seminar and learned the Wade Cook strategy for trading options.

19.   Needing cash to finance her newly acquired trading ambition, Spicuzza used Lockrem's money to pay for her purchases. Until the last month of his life in October 1997, however, Lockrem was totally unaware that she had invested his money in options.

20.   Upon information and belief, in August 1997, Spicuzza withdrew approximately $35,000 from the joint account and deposited those sums in her personal checking account without his consent.   This money was not invested; it was converted by Spicuzza for her own personal use.

-5-

GS00050

1    21.  It was not until October 1997 that Lockrem became aware

2    that his money was invested in options instead of mutual funds

3    and further that he had less than $3,600 in the bank to live.

4    22.  On October 8, 1997, Lockrem died by a reported suicide.

5    His death took place in his room at Spicuzza's home by hanging.

6    23.  The Kauai Police, who arrived on the scene immediately,

7    interviewed Spicuzza.  She informed them of the arrangement that

8    Lockrem and her were living together and told two different

9    police detectives that she had an arrangement whereby she

10   invested Lockrem's money in stocks and mutual funds and that the

11   principal investment would eventually be paid back to Lockrem and

12   that she and Lockrem had an agreement to split any potential

13   profits.  At no time did she disclose that she had invested his

14   funds in her own name at multiple brokerage firms or that

15   Lockrem's money had been invested in risky options.

16   24.  On October 10, 1997, the day following Lockrem's death,

17   his daughter, Arana, flew to Kauai to re-claim her deceased

18   father and his estate.  Arriving late that evening, she met with

19   Spicuzza the next morning at the Angel Inn.  Spicuzza asked if

20   she was included in any known Last Will and Testament.  After

21   being informed by Arana that she was not aware that Spicuzza was

22   included, Spicuzza told her that Lockrem had left her everything

23   before he died and that Arana was only entitled to a small bag

24   containing Lockrem's clothes.  Spicuzza claimed that everything

25   else, including Lockrem's money, personal computer and his hand-

26   made wood carvings belonged to her.

27   25.  Reluctantly, Spicuzza divulged the identity of the her

28

GS00051

1  joint account with Lockrem to Arana.  Thereafter, Arana checked

2  the balance in the joint account and discovered that her father

3  only had $3,600 left in cash of the approximate $222,000 that he

4  had the previous January.  She immediately requested and received

5  a "hold" on the account from the Kauai Federal Credit Union.

6      26.  After meeting with Arana, Spicuzza left the following

7  day for Seattle, Washington. There, Spicuzza took an advanced

8  Wade Cook course in option trading. Although claiming to be

9  bereaved about Lockrem's death, she immediately began trading his

10  money in options.

11      27.  Following Lockrem's death, Spicuzza stayed on the

12  mainland and did not return to Kauai for many weeks.  Upon her

13  return, however, she received a letter enclosing a final bank

14  account payout to Lockrem in the approximate amount of $2,100.

15  Although Lockrem was already deceased, Spicuzza deposited the

16  amount into their joint account and waited for the check to

17  clear.  After the check cleared, she withdrew that amount along

18  with the remaining $3,600 balance and transferred it to her

19  personal checking account.

20      28.  After Arana discovered that Spicuzza had liquidated the

21  last sum from joint account and that the "hold" had not prevented

22  the final withdrawal, she objected to the Kauai Federal Credit

23  Union.  The Credit Union, realizing its mistake, contacted

24  Spicuzza and demanded the return of the approximate $2,100.

25  Spicuzza refused.  Eventually, the Kauai Federal Credit Union had

26  to sue Spicuzza for the return of the funds.  After litigating

27  the issue in a Hawaii state court, the court ordered Spicuzza to

28

GS00052

1    return the funds.

2

3                        **FIRST CAUSE OF ACTION**

4                      **(Breach of Fiduciary Duty)**

5        29.  The Lockrem Estate repeats and realleges paragraphs 1

6    through 28 as though set forth in full herein.

7        30.  " A broker/dealer is a fiduciary who owes his customer

8    a high degree of care in transacting business."  Mansbach v.

9    Prescott, Ball & Turben, 598 F.2d 1017, 1026 (1979).

10   Respondents, through Spicuzza, served as Lockrem's broker for

11   approximately one year.  During this period, respondents owed a

12   fiduciary duty to Lockrem to act in the best interests of Lockrem

13   and to refrain from taking or authorizing any act that would

14   cause harm to Lockrem.

15       31.  Respondents breached their fiduciary duty to Lockrem

16   by, among other things:

17            a.  Taking Lockrem's monies and opening accounts with

18   three separate broker dealers in the name of Spicuzza;

19            b.  Investing Lockrem's funds into speculative single

20   issue securities, covered call options, straight options and

21   naked options;

22            c.  Failing to obtain Lockrem's authorization for each

23   transaction executed in the accounts;

24            d.  Failing to keep Lockrem adequately informed of the

25   true status of the accounts;

26            e.  Failing to make suitable investments on behalf of

27   Lockrem;

28

GS00053

f.   Converting approximately $220,000 from Lockrem and his Estate to their own benefit;

g.   Making fraudulent representations to Lockrem's heirs following his death in October, 1997;

h.   Continuing to trade Lockrem's monies after his death in October, 1997; and

i.   Failing to act in Lockrem's best interests.

32.   As a direct and proximate result of respondents' breach of fiduciary duty, Lockrem has been damaged in an amount to be proven at arbitration, in addition to interest at the maximum legal rate.

33.   Further, respondents actions were willful, wanton, malicious and oppressive and justify the award of exemplary and punitive damages against them.

## SECOND CAUSE OF ACTION

### (Conversion)

34.   The Lockrem Estate repeats and realleges paragraphs 1 through 33 as though set forth in full herein.

35.   As discussed above, Spicuzza converted approximately $220,000 from Lockrem and his Estate to her own personal use.

36.   Lockrem is informed and believes and, on that basis, alleges that Spicuzza currently has in her possession, custody or control monies and other properties of Lockrem.

37.   Lockrem is informed and believes and, on that basis, alleges that Spicuzza is aware that she has monies and other properties of Lockrem in her possession.   Nevertheless, Spicuzza

GS00054

1  refuses to return said property to Lockrem.

2      38.   The acts of Spicuzza constitute conversion.

3      39.   Lockrem is informed and believes and, on that basis,

4  alleges that as a result of Spicuzza's conduct, Lockrem has been

5  damaged in an amount to be proven at trial.

6      40.   Lockrem is informed and believes and, on that basis,

7  alleges that Spicuzza's actions were willful, wanton, malicious

8  and oppressive and justify the award of exemplary and punitive

9  damages against her and Prudential.

10               **THIRD CAUSE OF ACTION**

11                   (Fraud and Deceit)

12      41.   The Lockrem Estate repeats and realleges paragraphs 1

13  through 40 as though set forth in full herein.

14      42.   Spicuzza's representations and promises, as described

15  above, were false, misleading and deceitful at the time they were

16  made to Lockrem.

17      43.   At the time they made these representations and

18  promises, Spicuzza knew they were false, misleading and

19  deceitful.  Also, at the time they made the promises described

20  above, Spicuzza had neither the intention nor the ability to

21  fulfill them.

22      44.   Spicuzza made the representations and promises

23  described above with the intent that Lockrem would rely on them.

24  Lockrem did not know these representations and promises were

25  false, misleading and deceitful.  He actually, justifiably and

26  detrimentally relied on Spicuzza's representations and promises

27  by placing his money under Spicuzza's management and bestowing

28

GS00055

1  certain authorizations to act on his behalf.

2       45.   As a direct and proximate result of Spicuzza's

3  fraudulent and deceitful conduct, Lockrem has been damaged in an

4  amount to be proven at arbitration, in addition to interest at

5  the maximum legal rate.

6       46.   Further, Spicuzza's actions were willful, wanton,

7  malicious and oppressive and justify the award of exemplary and

8  punitive damages against her and Prudential.

9

10                       FOURTH CAUSE OF ACTION

11                        (Unauthorized Trading)

12       47.   The Lockrem Estate repeats and realleges paragraphs 1

13  through 46 as though set forth in full herein.

14       48.   Rule 2510(b) of the NASD Conduct Rules provides in

15  pertinent part:

16            "[n]o member or registered representative shall

17       exercise any discretionary power in a customer's

18       account unless such customer has given such prior

19       written authorization to a stated individual or

20       individuals and that the account has been accepted by

21       the member, as evidenced in writing by the member or

22       the partner, officer or manager, duly designated by the

23       member in accordance with Section 27 of these Rules.

24       49.   Lockrem did not provide Spicuzza with any

25  authorization, either written or oral, to trade on his account on

26  a discretionary basis.

27       50.   On numerous occasions Spicuzza used Lockrem's funds to

28

-11-                                        GS00056

trade securities without obtaining Lockrem's authorization.

51.  Spicuzza's unauthorized trading was done in furtherance of her scheme to defraud Lockrem.

52.  As a direct and proximate result of Spicuzza's conduct, Lockrem has been damaged in an amount to be proven at arbitration, in addition to interest at the maximum legal rate.

53.  Further, Spicuzza's actions were willful, wanton, malicious and oppressive and justify the award of exemplary and punitive damages against her and Prudential.

## FIFTH CAUSE OF ACTION

### (Elder Abuse)

54.  The Lockrem Estate repeats and realleges paragraphs 1 through 53 as though set forth in full herein.

55.  The applicable Elder Abuse Statutes provide for the protection of elder or dependent adults from among other things, "fiduciary abuse," which includes the following:

    a)    a situation in which any person who has the care or custody of, or who

    b)    stands in a position of trust to an elder or dependent adult;

    c)    takes, secretes, appropriates their money or property, to any use or purpose not in the due and lawful execution of his or her trust.

56.  At all relevant times Lockrem was an elder or dependent adult within the meaning of the applicable Elder Abuse Statute.

57.  Spicuzza stood in a position of trust to Lockrem due to

GS00057

1  their relationship.  Lockrem looked to Spicuzza to look out for

2  his best interests.  Instead, Spicuzza took advantage of

3  Lockrem's trust and age by, among other things, converting his

4  monies for her own benefit.

5      58.  As a direct and proximate result of Spicuzza's

6  violation of the applicable Elder Abuse Statutes of Arizona,

7  Nevada or Hawaii, Lockrem has been damaged in an amount to be

8  proven at arbitration, in addition to interest at the maximum

9  legal rate.

10

11                    **SIXTH CAUSE OF ACTION**

12                      (Selling Away)

13      59.  The Lockrem Estate repeats and realleges paragraphs 1

14  through 58 as though set forth in full herein.

15      60.  Rule 3030 of the NASD Conduct Rules provides in

16  pertinent part that:

17          No person associated with a member in any

18      registered capacity shall be employed by, or accept

19      compensation from, any other person as a result of any

20      business activity, other than a passive investment,

21      outside the scope of his relationship with his employer

22      firm, unless he has provided prompt written notice to

23      the member.

24      61.  Rule 3040 of the NASD Conduct Rules provides in

25  pertinent part that

26          Prior to participating in any private securities

27      transaction, an associated person shall provide written

28

GS00058

notice to the member with which he is associated,
describing in detail the proposed transaction and the
person's proposed role therein and stating whether he
has received or may receive selling compensation in
connection with the transaction.

62.  Spicuzza violated both Rule 3030 and 3040 by taking
Lockrem's monies and opening securities account in her name,
without providing any written notification to Prudential.

63.  Spicuzza further violated these rules by entering into
an agreement with Lockrem to invest his monies and split any
gains made from the investments, without providing any written
notification to Prudential.

64.  Spicuzza further violated these rules by trading in the
securities accounts of Lockrem for her benefit, without providing
any written notification to Prudential.

65.  Spicuzza further violated these rules by persuading
Lockrem to loan her other monies in exchange for her promise to
physically take care of him and allow him to live in a room in
her home,  without providing any written notification to
Prudential.

66.  Spicuzza further violated these rules by borrowing
approximately $110,000 from Lockrem to pay down her mortgage debt
and to pay for other personal expenses, again without providing
any written notification to Prudential.

67.  As a direct and proximate result of this conduct,
Lockrem has been damaged in an amount to be proven at
arbitration, in addition to interest at the maximum legal rate.

-14-

GS00059

1

2

### SEVENTH CAUSE OF ACTION

3

(Failure to Supervise Against Prudential and Prudential

4

Securities, Inc.)

5

68.   The Lockrem Estate repeats and realleges paragraphs 1

6

through 67 as though set forth in full herein.

7

69.   At all relevant times, Prudential's registered

8

representatives were independent contractors who operated other

9

businesses in addition to their securities business through

10

Prudential.

11

70.   Rule 3010 of the NASD Conduct Rules requires that each

12

member establish and maintain a system to supervise the

13

activities of each registered representative that is reasonably

14

designed to achieve compliance with applicable securities laws

15

and regulations and with the rules of the NASD.   It must include

16

written procedures that are established, maintained and enforced.

17

71.   Prudential did not have an adequate system of

18

supervision over the affairs of Spicuzza.   Prudential failed to

19

comply with its supervisory obligations over Spicuzza.

20

72.   Prudential's failure to establish and implement

21

adequate supervisory procedures over Spicuzza is inexcusable,

22

particularly in view of the NASD's dissemination to Prudential of

23

NASD Notice to Members 86-65, dated September 12, 1986, which

24

expressly warned NASD member firms that the NASD had observed a

25

pattern of rule violations and other regulatory problems stemming

26

from the employment of registered persons who engage in

27

securities-related activities on a full and part-time basis at

28

-15-

GS00060

1    locations away from the offices of the member.  The NASD pointed

2    out that these off-site representatives, often classified for

3    compensation purposes as independent contractors, are involved in

4    other business enterprises such as insurance, real estate sales,

5    accounting, or tax planning, and also frequently operate as

6    separate business entities under names other than those of the

7    members.  The NASD made the following observations concerning the

8    regulatory responsibilities of member firms that are of

9    particular relevance to this case:

10       Irrespective of an individual's location or

11       compensation arrangements, all associated persons are

12       considered to be employees of the firm with which they

13       are registered for purposes of compliance with NASD

14       rules governing the conduct of registered persons and

15       the supervisory responsibilities of the member.  The

16       fact that an associated person conducts business at a

17       separate location or is compensated as an independent

18       contractor does not alter the obligations of the

19       individual and the firm to comply fully with all

20       applicable regulatory requirements.

21

22       Firms employing off-site representatives are

23       responsible for establishing and carrying out

24       procedures that will subject these individuals to

25       effective supervision designed to monitor their

26       securities-related activities and to detect and prevent

27       regulatory compliance problems.  This can include:

28

-16-

GS00061

1.   Educating off-site personnel regarding their
obligations as registered persons to the firm and
to the public, including prohibited sales
practices.

2.   Maintaining regular and frequent contact with such
individuals.

3.   *Implementing appropriate supervisory practices, such as
records inspections and compliance audits at the
representatives' places of employment, to ensure that
their methods of business and day-to-day operations
comply with applicable rules and requirement.  For
greatest effectiveness in preventing and detecting
violations, visits should be unannounced and include,
for example, a review of on-site customer account
documentation and other books and records, meetings
with individual representatives to discuss the products
they are selling and their sales methods, and an
examination of correspondence and sales literature.*

*Firms whose off-site personnel also engage in
non-securities businesses should remind these
individuals that correspondence pertaining to
such businesses, unless submitted for review,
may not include material related to
securities transactions.*

-17-

GS00062

1
2
3
4
5
6
7
8

> If a member has designated an individual
> responsible for reviewing the activities of
> other registered persons within the firm, the
> office of that individual must be inspected
> annually, regardless of whether such person
> is compensated as an employee or as an
> independent contractor.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

> The actions of an associated person in
> dealing with customers and customer account,
> regardless of whether he or she is
> compensated as an employee or an independent
> contractor, are actions on behalf of the
> firm.  The firm is responsible for
> supervising in a manner designed to detect
> and prevent violations of Section 2 [the NASD
> suitability rule].  Members should take
> affirmative steps to ensure that off-site
> personnel understand and abide by NASD and
> firm policies regarding dealings with
> customers customer account and customer
> funds. (Emphasis added)

24
25
26
27
28

73.   Prudential is liable for Lockrem's transactions with
Spicuzza even if Prudential properly supervised Spicuzza, even if
Prudential was not aware of the recommendations by Spicuzza, even
if Prudential did not approve of the recommendations by Spicuzza,

-18-

1  and even if Lockrem's transactions were not processed through

2  Prudential.  The Fifth Circuit Court of appeals had the following

3  to say on this precise issue in the case of <u>Lewis</u> v. <u>Walston &</u>

4  <u>Co.</u> 487 F.2d. 617, 623-24 (5th Cir. 1973):

5      Walston argues that [the broker] was acting beyond the

6      scope of his employment.  For example, Walston did not

7      deal in unregistered securities.  Moreover, [the

8      broker] and the brokerage house did not perform their

9      usual role as brokers; that is, the transaction did not

10     involve the broker's placing an order through the

11     house's New York office, which was then executed by the

12     central office.  In this regard, they note that Walston

13     never stood to receive, and never did receive, any

14     commission or other financial benefits from the direct

15     and essentially private exchange [the broker] arranged.

16     . . . <u>Id</u>. At 623-24.

17

18     None of these superficially supportive bases for

19     Walston's argument precludes the conclusion that [the

20     broker's] actions were within the scope of his

21     employment.  That Walston did not deal in unregistered

22     securities addresses, only the question whether [the

23     broker's] conduct was authorized; . . . however,

24     **conduct may be within the scope of employment even if**

25     **it is unauthorized, if it is sufficiently similar to**

26     **authorized conduct.**  That the transactions did not

27     involve the execution of an order through the brokerage

28

-19-

GS00064

1  house also does not necessarily mean that [the

2  broker's] acts were without the scope of his

3  employment.  Brokers may and do take many actions in

4  the course of their dealings with customers that do not

5  relate directly to transactions executed through the

6  brokerage house; these actions are not for that reason

7  necessarily beyond the scope of the broker's

8  employment.  That Walston did not receive any financial

9  benefit from the transactions is not of controlling

10  importance.  If a particular act is authorized, or

11  sufficiently similar to an authorized act, finding that

12  act to be within the scope of employment <u>does not</u>

13  <u>require</u> that the act has conferred any particular

14  benefit, financial or otherwise, on the employer.  Id.

15  At 624.

16  74.  Likewise, the Sixth Circuit Court of Appeals opined in

17  the case of <u>Holloway</u> v. <u>Howerdd</u>, 536 F.2d 690, 695-96 (6th Cir.

18  1976):

19  [TSI, the broker-dealer, contends] "that it had no

20  knowledge of nor reasonable grounds to believe in the

21  existence of [the broker's] activity in publicly

22  selling unregistered stock." <u>Id</u>. At 695.

23

24  However, those persons who knew of [the broker's]

25  status with TSI and who were without knowledge that he

26  was acting separately from TSI were {correctly}

27  permitted to recover.

28

-20-

1  The liability of TSI is premised on the theory that "if

2  one appoints an agent to conduct a series of

3  transactions over a period of time, it is fair that he

4  should bear losses which are incurred when such an

5  agent, although without authority to do so, does

6  something which is usually done in connection with the

7  transactions he is employed to conduct."

8

9  There was no proof that TSI "usually" engaged in the

10  sales of unregistered stock.

11

12  TSI, however, had an affirmative obligation to prevent

13  use of the prestige of its firm to defraud the

14  investing public.  When it agents are dealing

15  individually in the sale of securities TSI must be

16  clearly disassociated from those transaction, as

17  otherwise it will incur liability on the basis of

18  respondent superior for the fraudulent representations

19  of its agents.

20

21  [T]he district Judge correctly . . . held TSI liable in

22  those plaintiffs who were without knowledge of

23  limitations on the agent's authority.  Id. At 696.[1]

24  75.  Prudential is liable because they participated in,

25  _____

26  [1]  Henricksen v. Henricksen and Smith Barney, 640 F2d 880, 887 (7th Cir. 1980) ("Under
   common law principles, a principle is liable for the deceit of its agent committed in the very
27  business he was appointed to carry out.  This is true even though the latter's specific conduct was
   carried on wihtout knowledge of lthe principal.")
28

-21-                                    G500066

1  aided and/or supervised all of the transactions heretofore

2  mentioned.  Prudential is also liable under agency principles and

3  the doctrine of *respondent superior* and controlling person for

4  the negligent actions and breaches of duty by Spicuzza while in

5  the scope of their employment, agency, and apparent agency with

6  Prudential.

7  .76.. As a direct and proximate result of Prudential's

8  failure to supervise Spicuzza's activities, Lockrem has been

9  damaged in an amount to be proven at arbitration, in addition to

10 interest at the maximum legal rate.

11                 EIGHTH CAUSE OF ACTION

12                      (Negligence)

13 77.  The Lockrem Estate repeats and realleges paragraphs 1

14 through 76 as though set forth in full herein.

15 78.  Respondents' violation of NASD rules constitutes

16 negligence.  As the Fifth Circuit observed in Miley v.

17 Oppenheimer & Co., Inc., 637 F.2d 318, 333 (5th Cir. 1981), the

18 NYSE and NASD rules are excellent tools against which to assess

19 in part the reasonableness or excessiveness of a broker's

20 handling of an investor's account," and the lower court properly

21 included a reference to those rules in its jury charge.  See

22 Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th

23 Cir. 1980) ("Appellants content that the admission of testimony

24 regarding the New York Stock Exchange and NASD rules served to

25 dignify those rules and regulations to some sort of standard.

26 The admission of testimony relating to those rules was proper

27 precisely because the rules reflect the standard to which all

28

                          -22-

1  brokers are held."). <u>See</u> <u>also</u> <u>Dean Witter Reynolds, Inc. v.</u>

2  <u>Hammock</u>, 489 So. 2d 761, 767 ) (1986) ("Case law is clear that

3  evidence of violation of industry standards is admissible as non-

4  conclusive evidence of negligence"); <u>St. Louis-San Francisco R.R.</u>

5  <u>Co. v. White</u>, 369 So.2d 1007 (Fla. 1st D.C.A. 1979); <u>St. Louis-</u>

6  <u>San Francisco R.R. Co. v. Burlison</u>, 262 So.2d 280 (Fla. 1st

7  D.C.A. 1972); <u>Clements v. Boca Aviation, Inc.</u> 444 So.2d 597 (Fla.

8  4th D.C.A. 1984); <u>Nance v. Winn Dixie Stores, Inc.</u> 436 So.2d 1075

9  (Fla. 3rd D.C.A. 1983); <u>Reese v. Seaboard Coastline R.R. Co.</u>, 360

10  So.2d 27 (Fla. 4th D.C.A. 1978).

11      79.  As indicated above, respondents violated, among other

12  things, Rules 2310, 2510, 3010, 3030 and 3040 of the NASD <u>Conduct</u>

13  <u>Rules</u>. These violations constitute prima facie evidence of

14  unreasonable handling of Lockrem's monies.

15      80.  Further, as indicated above, Prudential was negligent

16  for, among other things, failing to adequately supervise

17  Spicuzza.

18      81.  Prudential was further negligent in failing to inquire

19  as to the source of her investment funds although it knew, or

20  should have known, that Spicuzza did not earn anywhere near the

21  amount of money she invested and traded.

22      82.  As a direct and proximate result of the foregoing

23  conduct, Lockrem has been damaged in an amount to be proven at

24  arbitration, in addition to interest at the maximum legal rate.

25  ///

26  ///

27

28

-23-

GS00068

## NINTH CAUSE OF ACTION

### (Injunctive Relief Against Spicuzza)

83.   The Lockrem Estate repeats and realleges paragraphs 1 through 82 as though set forth in full herein.

84.   Spicuzza's retention of Lockrem's remaining monies, unless and until enjoined by the NASD, will cause great and irreparable injury to Lockrem in that there is a great likelihood that Spicuzza will dissipate the funds.

85.   Lockrem has no adequate remedy at law for the injuries currently being suffered and which will be suffered as a direct and proximate result of Spicuzza's actions, as described above.

///

///

WHEREFORE, Lockrem's Estate prays for judgement against respondents as follows:

### FIRST THROUGH FOURTH CAUSES OF ACTION

1.    Out of pocket damages in an amount to be proven at arbitration;

2.    Interest at the maximum legal rate; and

3.    Punitive damages;

### FIFTH THROUGH EIGHTH CAUSES OF ACTION

4.    Out of pocket damages in an amount to be proven at arbitration; and

5.    Interest at the maximum legal rate;

-24-

GS00069

1

**NINTH AND ALL CAUSES OF ACTION**

2

    6.  For preliminary and permanent injunctive relief

3

enjoining Spicuzza and her agents, servants, employees and those

4

persons acting in concert or participation with her, and each of

5

them, from engaging in or performing directly or indirectly any

6

and all of the following acts:

7

        (a)  Transferring, changing, wasting, dissipating,

8

converting, concealing, or otherwise disposing of, in any manner,

9

all funds that Spicuzza received from Lockrem or that is in the

10

possession of Spicuzza;

11

        (b)  Destroying, mutilating, concealing, transferring,

12

altering, or otherwise disposing of, in any manner, any books,

13

records, computer programs, computer files, computer printouts,

14

correspondence, memoranda, brochures, or any other documents of

15

any kind, pertaining in any manner to the funds that Spicuzza

16

received from Lockrem;

17

        (c)  Transferring, assigning, selling, hypothecating,

18

or otherwise disposing of any securities, any notes, investment

19

contracts, or other securities or any real property or

20

encumbering any real property of Spicuzza.

21

    7.  For preliminary and permanent injunctive relief placing

22

a freeze on all accounts at any bank, financial institution or

23

brokerage firm, all certificates of deposit or other funds or

24

assets, held in the name of, or for the benefit of, Spicuzza that

25

contain any or all of the funds that Spicuzza received from

26

Lockrem.

27

    8.  For all of Lockrem's Estate's attorneys fees and costs

28

GS00070

of litigation incurred in or related to this action;

    9.  For pre-judgment interest; and

    10.  For such other and further relief as the Arbitration Panel may deem just and proper.


    <u>ON ALL CAUSES OF ACTION</u>

    11.  For all of Lockrem's Estate's attorneys fees and costs of litigation incurred in or related to this action;

    12.  For pre-judgment interest; and

    13.  For such other and further relief as the Arbitration Panel may deem just and proper.

DATED: December 21, 2000        NASH & EDGERTON
                              SAMUEL Y. EDGERTON, III

                          By:  _____
                               Samuel Y. Edgerton, III
                               Attorneys for Claimants
                               Linda Arana, Executor of the
                               Estate of her late father,
                               Theodore Lockrem

GS00071

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles. I declare that I am over the age of eighteen (18) and not a party to this action. My business address is 2615 Pacific Coast Highway, Suite 322, Hermosa, California 90254.

On December 11 , 2000, I served the following document described as:

FIRST AMENDED STATEMENT OF CLAIM

on the interested parties in this action by placing the true copies thereof enclosed in sealed envelopes as stated on the attached mailing list:

Mr. Richard Berry
Mr. Rick Agbay
National Association of Securities Dealers, Inc.
300 So. Grand Avenue, #1620
Los Angeles, California 90071

Gail Spicuzza-Zorn
4064 Kaahumanu Place
Princeville, HI 96722-3597

Pruco Securities Corporation
Legal Department
751 Broad Street
Newark, N.J. 07102-3777

Prudential Securities Inc.
Legal Department
199 Water Street
New York, NY 10292-0129

(X)   I deposited such envelope in the mail at Hermosa Beach, California. The envelope was mailed with postage thereon fully prepaid.

( )   By Personal Service, I caused such envelope to be delivered by hand to David King, Esq. at the address listed above.

( )   By overnight courier, I caused the above-referenced document(s) to be delivered to an overnight courier service (Federal Express), for delivery to the above addressee(s).

( )   By facsimile machine I caused the above-referenced document(s) to be transmitted to the above-named person at the following telephone numbers above.

(X)   (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

( )   (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

GS00072

1  EXECUTED this 21 day of December, 2000 at Hermosa Beach, California.

2

3  BRENDA MURPHY

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GS00073

1

<u>PROOF OF SERVICE</u>

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

    I am employed in the County of Los Angeles.  I declare that I am over
the age of eighteen (18) and not a party to this action.  My business address
4
is 2615 Pacific Coast Highway, Suite 322, Hermosa, California 90254.

5

    On January 11, 2001, I served the following document described as:

6

    FIRST AMENDED PROOF OF SERVICE

7

on the interested parties in this action by placing the true copies thereof
enclosed in sealed envelopes as stated on the attached mailing list:
8

9

    Mr. Richard Berry
    Mr. Rick Agbay
    National Association of Securities Dealers, Inc.
10
    300 So. Grand Avenue, #1620
    Los Angeles, California 90071
11

    Gail Spicuzza-Zorn
12
    4064 Kaahumanu Place
    Princeville, HI 96722-3597
13

    Gail Spicuzza-Zorn
14
    6712-A Shincke Road, N.E.
    Olympia, Washington 98506
15

    Pruco Securities Corporation
16
    Legal Department
    751 Broad Street
17
    Newark, N.J.  07102-3777

18
    Prudential Securities Inc.
    Legal Department
19
    199 Water Street
    New York, NY 10292-0129
20

21  (X)  I deposited such envelope in the mail at Hermosa Beach, California.  The
         envelope was mailed with postage thereon fully prepaid.
22

23  ( )  By Personal Service, I caused such envelope to be delivered by hand to
         David King, Esq. at the address listed above.

24  ( )  By overnight courier, I caused the above-referenced document(s) to be
         delivered to an overnight courier service (Federal Express), for
25       delivery to the above addressee(s).

26  ( )  By facsimile machine I caused the above-referenced document(s) to be
         transmitted to the above-named person at the following telephone numbers
27       above.

28  (X)  (STATE)  I declare under penalty of perjury under the laws of the State

-27-                                          GS00074

1    of California that the above is true and correct.

2    ( )    (FEDERAL) I declare that I am employed in the office of a member of the
3    bar of this court at whose direction the service was made.

     EXECUTED this _11_ day of January, 2001 at Hermosa Beach, California.

4

5    _Brenda Murphy_

6    BRENDA MURPHY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GS00075