

*Professional Corporation*

**WEISS**
**JENSEN**
**ELLIS &**
**HOWARD**

ATTORNEYS AT LAW

2600 PIKE TOWER
520 PIKE STREET
SEATTLE, WA 98101

TEL 206.340.1825
FAX 206.623.4363

1-800-736-2554
mail@weiss-law.com
w.weiss-law.com

February 7, 2001

*VIA FACSIMILE (213) 236-1735 & US MAIL*

Ms. Colleen Leach
General Star Management Co.
550 South Hope Street
Suite 700
Los Angeles, CA 90071

**Re:    Gail Spicuzza**
**Our File No. 95182.002**

Dear Ms. Leach:

Thank you for taking my call this morning.  I enclose for you a copy of the arbitration claim filed against Ms. Spicuzza and Prudential.  Furthermore, I enclose for your review a copy of my résumé.

Much of this claim, if not the entire claim, arises out of facts which my firm developed in an arbitration in which Ms. Spicuzza sued another broker-dealer for statutory rescission of securities transactions involving monies which had come from the joint savings account in the names of Ms. Spicuzza and Mr. Lockrem.  The defense counsel in that claim is the claimant's counsel in this claim.  I have extensive and detailed knowledge of the facts of the underlying arbitration.  Of course, my files are open to you for your review.

As you can see from my enclosed résumé, I have extensive experience in the matters, and am routinely retained to defend brokers and broker-dealers from regulatory action, and civil claims in arbitration and in court. Retaining me, at least in the capacity of special counsel could add great efficiencies to the upcoming proceedings.  You can view more information on our firm at http://www.weiss-law.com.

**EXHIBIT "4"**

F:\SPICUZZA\ARANA\LEACH 020701.DOC

GS00042

PORTLAND OFFICE: 2300 US BANCORP TOWER, 111 SW FIFTH AVE, PORTLAND, OR. 97204, TEL 503.243.2300 FAX 503.241.8014

February 7, 2001
Page 2


I look forward to your early review of these materials and a call to flesh out strategy. As I indicated, my client needs to provide some response to arbitration claim by February 16.

Very truly yours,

WEISS JENSEN ELLIS & HOWARD

John A. Bender

JAB/tjb

Encls

cc:     Ron Alberts

# JOHN A. BENDER
## 520 PIKE STREET, SUITE 2600
## SEATTLE, WASHINGTON 98101
## (206) 340-1825

## Professional Experience

Lead Counsel in complex securities, unfair trade practice, employment, and commercial litigation matters in federal and state courts and arbitrations. Arbitrator and Mediator in commercial, securities, employment and domain name disputes for various arbitration forums. Counsel to securities houses on startup planning, new securities e-business concepts and securities regulatory concerns. Consultant to National Association of Securities Dealers on arbitrator training, arbitrator recruitment, adjudicative process, and employment issues in the securities industry.

## Employment History

### Weiss, Jensen, Ellis & Howard, Seattle, WA, Shareholder                    1991-present

Counsel to Securities Industry members on securities regulatory and dispute resolution issues. Litigation of securities, unfair trade practice, unfair competition, employment, fraud and secured lending matters. Arbitrator and mediator in a variety of commercial, securities, employment and domain name disputes.

*Practice Profile*:

Counseling Broker-dealers and new business ventures on venture capital, business and capital planning and securities laws relating to myriad money raising and business strategies.

Manage the firm's financial services dispute practice, including representing broker/dealers, registered representatives, and consumers, in securities litigation and arbitration claims, including all types of consumer claims, non-compete, employment, and unfair competition claims.

Representation of various national and regional broker dealers in litigation and arbitration of matters involving the $400,000,000.00 Towers Financial Corporation "Ponzi" fraud.

Representation of multi-state mortgage company in complex multi-million-dollar lender liability litigation in Federal and State courts in which the client prevailed in all respects.

Local Representation of a major California bank in fraud, receivership, and foreclosure matters regarding multi-million dollar real property transactions and workouts.

Local Representation of an international tire and rubber company in complex real estate and employment litigation.

### Essenburg & Staton, Seattle WA, Federal & Todd, Atlanta, GA.              1985-1990

*Practice Profile*:

Trial Attorney in employment, consumer protection, securities, commercial, real estate, and construction matters.

## Education and Organizations

| | |
|---|---|
| Seattle University School of Law (Univ. Puget Sound) | JD, 1985 |
| Emory University Law School, Atlanta, GA.<br>Editorial Board, Bankruptcy Developments Journal | 1984-1985 |
| Saint Martin's College, Olympia, WA. | BA, 1982 |

## Memberships/Affiliations

Member of State Bar of Georgia, Washington State Bar, King County Bar Association, American Bar Association.

Member of the litigation sections of the various bar associations

Arbitrator for the National Association of Securities Dealers, New York Stock Exchange, Pacific Stock Exchange, National Futures Association, American Arbitration Association, and National Arbitration Forum.

Arbitrator instructor appointed by the securities industry, and involved in the training of hundreds of securities arbitrators throughout the United States regarding the securities arbitration process and employment disputes within the securities industry.

Keynote speaker and instructor in more than 20 CLE seminars in fifteen cities throughout the United States during the past five years.

*Pro tem* Judge, King County, WA. 1997 – present

## Publications

*"Grab the Arbitrators' Minds and Their Hearts Will Follow"*, Securities Arbitration 1999, Settlements, Laptops, Experts & Arbitrators, Practicing Law Institute Course Book B-1131, pg. 559 (PLI 1999)

"Securities Arbitrators Training", Securities Arbitration 1998, Redefining Practices and Techniques, Practicing Law Institute Course Book B-1061, pg. 283 (PLI 1998).

"Inside NASDR's Training Program", Securities Arbitration 1997, Arbitration Comes of Age, Practicing Law Institute Course Book B-998, pg. 763 (PLI 1997).

"The Torok Tort: Recovery for Abusive Litigation," 23 Ga. St. Bar Journal 84 (1986).

"Chapter 11: Policy in Flux," 2 Bankr. Dev. Jour.133 (1985)

## Articles Referenced By

Securities Arbitration Procedure Manual, Third Edition, Chapter 10, "Arbitrators at the SRO's. . . " PP 453-459, David E. Robbins, Lexis Law Publishing 1998.

*References Provided Upon Request*



NASH & EDGERTON
SAMUEL Y. EDGERTON, III (CA Bar No. 127156)
2615 Pacific Coast Highway, Suite 322
Hermosa Beach, California 90254
Telephone: (310) 937-2066
Facsimile: (310) 937-2064

Attorneys for Claimant
Linda Arana, Executor of the Estate of
her late father, Theodore Lockrem

RECEIVED

JAN 19 2001

WEISS, JENSEN
ELLIS & HOWARD

BEFORE THE

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

| | |
|---|---|
| LINDA ARANA, Executor of the Estate of her late father, Theodore Lockrem, Deceased | NASD Case No.: 00-04488 |
| Claimant, v. | FIRST AMENDED STATEMENT OF CLAIM FOR BREACH OF FIDUCIARY DUTY; CONVERSION; FRAUD AND DECEIT; UNAUTHORIZED TRADING; ELDER ABUSE; SELLING AWAY; FAILURE TO SUPERVISE; NEGLIGENCE; AND INJUNCTIVE RELIEF |
| PRUCO SECURITIES, CORPORATION, a Delaware Corporation, PRUDENTIAL SECURITIES, INC., a Delaware Corporation and GAIL SPICUZZA, an individual | |
| Respondents. | |

Claimant, Linda Arana, the Executor of the Estate of her

late father, Theodore Lockrem ("Lockrem") (collectively referred

to as the "Lockrem Estate"), allege as follows:

I.

**THE PARTIES**

1.   Lockrem, formerly of Page, Arizona, passed away on

October 8, 1997.  At the time of his death, he was 72 years old

and going blind.  At the time of his death, he was renting a room

in Princeville, Kauai, at a house owned by respondent Gail

GS00046

Spicuzza ("Spicuzza").

2.  Arana is the only surviving family member of Lockrem.
She is the Executor of his Last Will and Testament.  She and her
husband, along with their two children, live in Las Vegas,
Nevada.

3.  Pruco Securities Corporation ("Prudential") a wholly
owned subsidiary of Prudential Insurance Company of America.  It
is a registered broker-dealer and a member firm and of the
National Association of Securities Dealers, Inc. ("NASD").  Its
principal place of business is in Newark, New Jersey, although it
has offices in all 50 states.

4.  Prudential Securities, Inc. is a registered broker-
dealer and a member firm of the National Association of
Securities Dealers, Inc.  Its principal place of business is
located in New York, New York.  As a wholly owned subsidiary of
Prudential Insurance Company of America, it provided oversight
authority over the securities operations of Prudential during
this time period.

5.  Spicuzza, age 51, is the owner of a bed and breakfast
called the "Angel Inn" located in Princeville, Kauai.  Her bed
and breakfast is marketed on the Internet as a place run "by
angels."  A former nun in the 1970's, Spicuzza left the convent
and went into private business.  In 1984, she joined IDS
Financial Services and passed the Series Seven exam.  Thereafter,
she joined Prudential as an insurance salesperson and registered
representative.  At all relevant times hereto, she was an
affiliated person of Prudential and employed as an insurance

-2-

GS00047

1  salesperson and securities registered representative out of

2  Prudential's Honolulu, Hawaii office.

3

4                              II.

5                    **NATURE OF THE CASE**

6      6.  This action arises from the fraud and deceit of

7  Spicuzza in converting approximately $220,000 from Lockrem and

8  his Estate to her own personal use.

9                              III.

10                  **GENERAL ALLEGATIONS**

11     7.  In or about December 1996, Lockrem, a retired widower,

12  traveled to Kauai, Hawaii to visit friends and to look into

13  purchasing a retirement condominium there.  During the trip, he

14  met Spicuzza and became romantically interested in her.

15  Spicuzza, a Prudential registered representative, enticed him to

16  liquidate all assets so that she could invest his money with her

17  upon the representation that his money would be invested with

18  Prudential Securities, Inc. and other securities brokerages

19  located in the continental United States.

20     8.  Specifically, Spicuzza promised Lockrem that she would

21  split the profits on any gains made from his securities

22  investments that she would manage.  By her own admission, she

23  represented to him that his money would be invested in stocks and

24  mutual funds.  Thereafter, Lockrem kept a written list of the

25  brokerage firms where Spicuzza had invested his money.

26  Prudential was on that list.

27     9.  At or about the same time, Spicuzza, with a net annual

28

GS00048

income of less than $20,000, persuaded Lockrem to loan her other monies in exchange for her promise to physically take care of him and allow him to live at her home for the rest of his life.

10.  In or about June 1997, in reliance on the promises made above, Lockrem decided not to purchase a condominium.  Instead, he decided to sell his home in Page, Arizona and move in with Spicuzza.  Thereafter, Lockrem allowed Spicuzza to manage all of his finances.

11.  From January 1997, until his death in October 1997, Spicuzza, in violation of Prudential policy, borrowed approximately $110,000 from Lockrem to pay down her mortgage debt and to pay for other personal expenses.

12.  In July 1997, Lockrem moved in with Spicuzza at her Kauai home. Spicuzza persuaded Lockrem to open up a joint savings account at the Kauai Federal Credit Union where she also maintained a private checking account.

13.  Upon opening the joint savings account, Lockrem deposited $109,751.  These monies derived from the sale of Lockrem's Page, Arizona home.  With the opening of the joint account, Spicuzza invested Lockrem's money in several newly-opened brokerage accounts at unrelated brokerage firms on the mainland in her name only.  In violation of the NASD Rules of Conduct she invested in excess of $70,000 in these brokerage accounts held in her name only.  The source of those funds came from Lockrem, through withdrawals made from the joint savings account and by approximately $20,000 in travelers checks purchased with Lockrem's remaining house sale money.

-4-

GS00049

14. Unbeknownst to Lockrem, Spicuzza did not invest Lockrem's money in bonds and mutual funds. Instead she invested Lockrem's money in unsuitable, single issue equity securities, covered call options, straight options and naked options.

15. At all relevant times, Prudential was aware that its registered representative, Spicuzza, was opening outside brokerage accounts in her name to purchase securities.

16. Prudential failed to inquire as to the source of her investment funds although it Prudential knew or should have known that Spicuzza did not earn anywhere near the amount of income to be trading in excess of $70,000 in multiple securities accounts.

17. Spicuzza's plan to earn money stemmed from the fact that she earned less than $20,000 a year as reported on her tax returns. Desperate for money to maintain her lifestyle, she wished to make high returns by trading in speculative securities.

18. In 1997, Spicuzza enrolled in a Wade Cook investment seminar and learned the Wade Cook strategy for trading options.

19. Needing cash to finance her newly acquired trading ambition, Spicuzza used Lockrem's money to pay for her purchases. Until the last month of his life in October 1997, however, Lockrem was totally unaware that she had invested his money in options.

20. Upon information and belief, in August 1997, Spicuzza withdrew approximately $35,000 from the joint account and deposited those sums in her personal checking account without his consent. This money was not invested; it was converted by Spicuzza for her own personal use.

GS00050

21.   It was not until October 1997 that Lockrem became aware
that his money was invested in options instead of mutual funds
and further that he had less than $3,600 in the bank to live.

22.   On October 8, 1997, Lockrem died by a reported suicide.
His death took place in his room at Spicuzza's home by hanging.

23.   The Kauai Police, who arrived on the scene immediately,
interviewed Spicuzza.  She informed them of the arrangement that
Lockrem and her were living together and told two different
police detectives that she had an arrangement whereby she
invested Lockrem's money in stocks and mutual funds and that the
principal investment would eventually be paid back to Lockrem and
that she and Lockrem had an agreement to split any potential
profits.  At no time did she disclose that she had invested his
funds in her own name at multiple brokerage firms or that
Lockrem's money had been invested in risky options.

24.   On October 10, 1997, the day following Lockrem's death,
his daughter, Arana, flew to Kauai to re-claim her deceased
father and his estate.  Arriving late that evening, she met with
Spicuzza the next morning at the Angel Inn.  Spicuzza asked if
she was included in any known Last Will and Testament.  After
being informed by Arana that she was not aware that Spicuzza was
included, Spicuzza told her that Lockrem had left her everything
before he died and that Arana was only entitled to a small bag
containing Lockrem's clothes.  Spicuzza claimed that everything
else, including Lockrem's money, personal computer and his hand-
made wood carvings belonged to her.

25.   Reluctantly, Spicuzza divulged the identity of the her

GS00051

joint account with Lockrem to Arana.   Thereafter, Arana checked the balance in the joint account and discovered that her father only had $3,600 left in cash of the approximate $222,000 that he had the previous January.  She immediately requested and received a "hold" on the account from the Kauai Federal Credit Union.

26.   After meeting with Arana, Spicuzza left the following day for Seattle, Washington. There, Spicuzza took an advanced Wade Cook course in option trading.  Although claiming to be bereaved about Lockrem's death, she immediately began trading his money in options.

27.   Following Lockrem's death, Spicuzza stayed on the mainland and did not return to Kauai for many weeks.  Upon her return, however, she received a letter enclosing a final bank account payout to Lockrem in the approximate amount of $2,100. Although Lockrem was already deceased, Spicuzza deposited the amount into their joint account and waited for the check to clear.  After the check cleared, she withdrew that amount along with the remaining $3,600 balance and transferred it to her personal checking account.

28.   After Arana discovered that Spicuzza had liquidated the last sum from joint account and that the "hold" had not prevented the final withdrawal, she objected to the Kauai Federal Credit Union.  The Credit Union, realizing its mistake, contacted Spicuzza and demanded the return of the approximate $2,100. Spicuzza refused.  Eventually, the Kauai Federal Credit Union had to sue Spicuzza for the return of the funds.  After litigating the issue in a Hawaii state court, the court ordered Spicuzza to

CS00052

1  return the funds.

2

3                    **FIRST CAUSE OF ACTION**

4                    (Breach of Fiduciary Duty)

5      29.  The Lockrem Estate repeats and realleges paragraphs 1

6  through 28 as though set forth in full herein.

7      30.  " A broker/dealer is a fiduciary who owes his customer

8  a high degree of care in transacting business."  Mansbach v.

9  Prescott, Ball & Turben, 598 F.2d 1017, 1026 (1979).

10 Respondents, through Spicuzza, served as Lockrem's broker for

11 approximately one year.  During this period, respondents owed a

12 fiduciary duty to Lockrem to act in the best interests of Lockrem

13 and to refrain from taking or authorizing any act that would

14 cause harm to Lockrem.

15     31.  Respondents breached their fiduciary duty to Lockrem

16 by, among other things:

17         a.  Taking Lockrem's monies and opening accounts with

18 three separate broker dealers in the name of Spicuzza;

19         b.  Investing Lockrem's funds into speculative single

20 issue securities, covered call options, straight options and

21 naked options;

22         c.  Failing to obtain Lockrem's authorization for each

23 transaction executed in the accounts;

24         d.  Failing to keep Lockrem adequately informed of the

25 true status of the accounts;

26         e.  Failing to make suitable investments on behalf of

27 Lockrem;

28

                              -8-                        GS00053

f.   Converting approximately $220,000 from Lockrem and his Estate to their own benefit;

g.   Making fraudulent representations to Lockrem's heirs following his death in October, 1997;

h.   Continuing to trade Lockrem's monies after his death in October, 1997; and

i.   Failing to act in Lockrem's best interests.

32.   As a direct and proximate result of respondents' breach of fiduciary duty, Lockrem has been damaged in an amount to be proven at arbitration, in addition to interest at the maximum legal rate.

33.   Further, respondents actions were willful, wanton, malicious and oppressive and justify the award of exemplary and punitive damages against them.

## SECOND CAUSE OF ACTION

### (Conversion)

34.   The Lockrem Estate repeats and realleges paragraphs 1 through 33 as though set forth in full herein.

35.   As discussed above, Spicuzza converted approximately $220,000 from Lockrem and his Estate to her own personal use.

36.   Lockrem is informed and believes and, on that basis, alleges that Spicuzza currently has in her possession, custody or control monies and other properties of Lockrem.

37.   Lockrem is informed and believes and, on that basis, alleges that Spicuzza is aware that she has monies and other properties of Lockrem in her possession.  Nevertheless, Spicuzza

-9-

GS00054

1 | refuses to return said property to Lockrem.

2 |     38.   The acts of Spicuzza constitute conversion.

3 |     39.   Lockrem is informed and believes and, on that basis,

4 | alleges that as a result of Spicuzza's conduct, Lockrem has been

5 | damaged in an amount to be proven at trial.

6 |     40.   Lockrem is informed and believes and, on that basis,

7 | alleges that Spicuzza's actions were willful, wanton, malicious

8 | and oppressive and justify the award of exemplary and punitive

9 | damages against her and Prudential.

### THIRD CAUSE OF ACTION

### (Fraud and Deceit)

12 |     41.   The Lockrem Estate repeats and realleges paragraphs 1

13 | through 40 as though set forth in full herein.

14 |     42.   Spicuzza's representations and promises, as described

15 | above, were false, misleading and deceitful at the time they were

16 | made to Lockrem.

17 |     43.   At the time they made these representations and

18 | promises, Spicuzza knew they were false, misleading and

19 | deceitful.  Also, at the time they made the promises described

20 | above, Spicuzza had neither the intention nor the ability to

21 | fulfill them.

22 |     44.   Spicuzza made the representations and promises

23 | described above with the intent that Lockrem would rely on them.

24 | Lockrem did not know these representations and promises were

25 | false, misleading and deceitful.  He actually, justifiably and

26 | detrimentally relied on Spicuzza's representations and promises

27 | by placing his money under Spicuzza's management and bestowing

28 |

GS00055

1  certain authorizations to act on his behalf.

2  45.  As a direct and proximate result of Spicuzza's

3  fraudulent and deceitful conduct, Lockrem has been damaged in an

4  amount to be proven at arbitration, in addition to interest at

5  the maximum legal rate.

6  46.  Further, Spicuzza's actions were willful, wanton,

7  malicious and oppressive and justify the award of exemplary and

8  punitive damages against her and Prudential.

9

10  ### FOURTH CAUSE OF ACTION

11  ### (Unauthorized Trading)

12  47.  The Lockrem Estate repeats and realleges paragraphs 1

13  through 46 as though set forth in full herein.

14  48.  Rule 2510(b) of the NASD Conduct Rules provides in

15  pertinent part:

16  "[n]o member or registered representative shall

17  exercise any discretionary power in a customer's

18  account unless such customer has given such prior

19  written authorization to a stated individual or

20  individuals and that the account has been accepted by

21  the member, as evidenced in writing by the member or

22  the partner, officer or manager, duly designated by the

23  member in accordance with Section 27 of these Rules.

24  49.  Lockrem did not provide Spicuzza with any

25  authorization, either written or oral, to trade on his account on

26  a discretionary basis.

27  50.  On numerous occasions Spicuzza used Lockrem's funds to

28

-11-

GS00056

1   trade securities without obtaining Lockrem's authorization.

2       51.   Spicuzza's unauthorized trading was done in furtherance

3   of her scheme to defraud Lockrem.

4       52.   As a direct and proximate result of Spicuzza's conduct,

5   Lockrem has been damaged in an amount to be proven at

6   arbitration, in addition to interest at the maximum legal rate.

7       53.   Further, Spicuzza's actions were willful, wanton,

8   malicious and oppressive and justify the award of exemplary and

9   punitive damages against her and Prudential.

10

11                      **FIFTH CAUSE OF ACTION**

12                         (Elder Abuse)

13      54.   The Lockrem Estate repeats and realleges paragraphs 1

14  through 53 as though set forth in full herein.

15      55.   The applicable Elder Abuse Statutes provide for the

16  protection of elder or dependent adults from among other things,

17  "fiduciary abuse," which includes the following:

18      a)   a situation in which any person who has the care or

19           custody of, or who

20      b)   stands in a position of trust to an elder or dependent

21           adult;

22      c)   takes, secretes, appropriates their money or property,

23           to any use or purpose not in the due and lawful

24           execution of his or her trust.

25      56.   At all relevant times Lockrem was an elder or dependent

26  adult within the meaning of the applicable Elder Abuse Statute.

27      57.   Spicuzza stood in a position of trust to Lockrem due to

28

                              -12-

GS00057

their relationship.  Lockrem looked to Spicuzza to look out for

his best interests.  Instead, Spicuzza took advantage of

Lockrem's trust and age by, among other things, converting his

monies for her own benefit.

58.  As a direct and proximate result of Spicuzza's

violation of the applicable Elder Abuse Statutes of Arizona,

Nevada or Hawaii, Lockrem has been damaged in an amount to be

proven at arbitration, in addition to interest at the maximum

legal rate.

## SIXTH CAUSE OF ACTION

### (Selling Away)

59.  The Lockrem Estate repeats and realleges paragraphs 1

through 58 as though set forth in full herein.

60.  Rule 3030 of the NASD Conduct Rules provides in

pertinent part that:

No person associated with a member in any

registered capacity shall be employed by, or accept

compensation from, any other person as a result of any

business activity, other than a passive investment,

outside the scope of his relationship with his employer

firm, unless he has provided prompt written notice to

the member.

61.  Rule 3040 of the NASD Conduct Rules provides in

pertinent part that

Prior to participating in any private securities

transaction, an associated person shall provide written

-13-

GS00058

notice to the member with which he is associated,

describing in detail the proposed transaction and the

person's proposed role therein and stating whether he

has received or may receive selling compensation in

connection with the transaction.

62.  Spicuzza violated both Rule 3030 and 3040 by taking
Lockrem's monies and opening securities account in her name,
without providing any written notification to Prudential.

63.  Spicuzza further violated these rules by entering into
an agreement with Lockrem to invest his monies and split any
gains made from the investments, without providing any written
notification to Prudential.

64.  Spicuzza further violated these rules by trading in the
securities accounts of Lockrem for her benefit, without providing
any written notification to Prudential.

65.  Spicuzza further violated these rules by persuading
Lockrem to loan her other monies in exchange for her promise to
physically take care of him and allow him to live in a room in
her home,  without providing any written notification to
Prudential.

66.  Spicuzza further violated these rules by borrowing
approximately $110,000 from Lockrem to pay down her mortgage debt
and to pay for other personal expenses, again without providing
any written notification to Prudential.

67.  As a direct and proximate result of this conduct,
Lockrem has been damaged in an amount to be proven at
arbitration, in addition to interest at the maximum legal rate.

-14-

G300059

1
2

## SEVENTH CAUSE OF ACTION

3

(Failure to Supervise Against Prudential and Prudential

4

Securities, Inc.)

5

68.   The Lockrem Estate repeats and realleges paragraphs 1

6

through 67 as though set forth in full herein.

7

69.   At all relevant times, Prudential's registered

8

representatives were independent contractors who operated other

9

businesses in addition to their securities business through

10

Prudential.

11

70.   Rule 3010 of the NASD Conduct Rules requires that each

12

member establish and maintain a system to supervise the

13

activities of each registered representative that is reasonably

14

designed to achieve compliance with applicable securities laws

15

and regulations and with the rules of the NASD.   It must include

16

written procedures that are established, maintained and enforced.

17

71.   Prudential did not have an adequate system of

18

supervision over the affairs of Spicuzza.   Prudential failed to

19

comply with its supervisory obligations over Spicuzza.

20

72.   Prudential's failure to establish and implement

21

adequate supervisory procedures over Spicuzza is inexcusable,

22

particularly in view of the NASD's dissemination to Prudential of

23

NASD Notice to Members 86-65, dated September 12, 1986, which

24

expressly warned NASD member firms that the NASD had observed a

25

pattern of rule violations and other regulatory problems stemming

26

from the employment of registered persons who engage in

27

securities-related activities on a full and part-time basis at

28

-15-

GS00060

locations away from the offices of the member.  The NASD pointed

out that these off-site representatives, often classified for

compensation purposes as independent contractors, are involved in

other business enterprises such as insurance, real estate sales,

accounting, or tax planning, and also frequently operate as

separate business entities under names other than those of the

members.   The NASD made the following observations concerning the

regulatory responsibilities of member firms that are of

particular relevance to this case:

> Irrespective of an individual's location or
>
> compensation arrangements, all associated persons are
>
> considered to be employees of the firm with which they
>
> are registered for purposes of compliance with NASD
>
> rules governing the conduct of registered persons and
>
> the supervisory responsibilities of the member.   The
>
> fact that an associated person conducts business at a
>
> separate location or is compensated as an independent
>
> contractor does not alter the obligations of the
>
> individual and the firm to comply fully with all
>
> applicable regulatory requirements.

> Firms employing off-site representatives are
>
> responsible for establishing and carrying out
>
> procedures that will subject these individuals to
>
> effective supervision designed to monitor their
>
> securities-related activities and to detect and prevent
>
> regulatory compliance problems.   This can include:

GS00061

1.   Educating off-site personnel regarding their
     obligations as registered persons to the firm and
     to the public, including prohibited sales
     practices.

2.   Maintaining regular and frequent contact with such
     individuals.

3.   *Implementing appropriate supervisory practices, such as
     records inspections and compliance audits at the
     representatives' places of employment, to ensure that
     their methods of business and day-to-day operations
     comply with applicable rules and requirement. For
     greatest effectiveness in preventing and detecting
     violations, visits should be unannounced and include,
     for example, a review of on-site customer account
     documentation and other books and records, meetings
     with individual representatives to discuss the products
     they are selling and their sales methods, and an
     examination of correspondence and sales literature.*

     Firms whose off-site personnel also engage in
     non-securities businesses should remind these
     individuals that correspondence pertaining to
     such businesses, unless submitted for review,
     may not include material related to
     securities transactions.

-17-

GS00062

1
2
3
4
5
6
7
8

   If a member has designated an individual
responsible for reviewing the activities of
other registered persons within the firm, the
office of that individual must be inspected
annually, regardless of whether such person
is compensated as an employee or as an
independent contractor.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

   The actions of an associated person in
dealing with customers and customer account,
regardless of whether he or she is
compensated as an employee or an independent
contractor, are actions on behalf of the
firm.  The firm is responsible for
supervising in a manner designed to detect
and prevent violations of Section 2 [the NASD
suitability rule].  Members should take
affirmative steps to ensure that off-site
personnel understand and abide by NASD and
firm policies regarding dealings with
customers customer account and customer
funds. (Emphasis added)

24
25
26
27
28

  73.  Prudential is liable for Lockrem's transactions with
Spicuzza even if Prudential properly supervised Spicuzza, even if
Prudential was not aware of the recommendations by Spicuzza, even
if Prudential did not approve of the recommendations by Spicuzza,

GS00063

1  and even if Lockrem's transactions were not processed through

2  Prudential.   The Fifth Circuit Court of appeals had the following

3  to say on this precise issue in the case of Lewis v. Walston &

4  Co. 487 F.2d 617, 623-24 (5th Cir. 1973):

5      Walston argues that [the broker] was acting beyond the

6      scope of his employment.  For example, Walston did not

7      deal in unregistered securities.  Moreover, [the

8      broker] and the brokerage house did not perform their

9      usual role as brokers; that is, the transaction did not

10     involve the broker's placing an order through the

11     house's New York office, which was then executed by the

12     central office.  In this regard, they note that Walston

13     never stood to receive, and never did receive, any

14     commission or other financial benefits from the direct

15     and essentially private exchange [the broker] arranged.

16     . . .Id. At 623-24.

17

18     None of these superficially supportive bases for

19     Walston's argument precludes the conclusion that [the

20     broker's] actions were within the scope of his

21     employment.  That Walston did not deal in unregistered

22     securities addresses, only the question whether [the

23     broker's] conduct was authorized; . . . however,

24     conduct may be within the scope of employment even if

25     it is unauthorized, if it is sufficiently similar to

26     authorized conduct.  That the transactions did not

27     involve the execution of an order through the brokerage

28

-19-

GS00064

house also does not necessarily mean that [the

broker's] acts were without the scope of his

employment.  Brokers may and do take many actions in

the course of their dealings with customers that do not

relate directly to transactions executed through the

brokerage house; these actions are not for that reason

necessarily beyond the scope of the broker's

employment.  That Walston did not receive any financial

benefit from the transactions is not of controlling

importance.  If a particular act is authorized, or

sufficiently similar to an authorized act, finding that

act to be within the scope of employment <u>does not</u>

<u>require</u> that the act has conferred any particular

benefit, financial or otherwise, on the employer.  Id.

At 624.

74.  Likewise, the Sixth Circuit Court of Appeals opined in

the case of <u>Holloway</u> v. <u>Howerdd</u>, 536 F.2d 690, 695-96 (6th Cir.

1976):

[TSI, the broker-dealer, contends] "that it had no

knowledge of nor reasonable grounds to believe in the

existence of [the broker's] activity in publicly

selling unregistered stock." <u>Id</u>. At 695.


However, those persons who knew of [the broker's]

status with TSI and who were without knowledge that he

was acting separately from TSI were {correctly]

permitted to recover.

GS00065

1   The liability of TSI is premised on the theory that "if

2   one appoints an agent to conduct a series of

3   transactions over a period of time, it is fair that he

4   should bear losses which are incurred when such an

5   agent, although without authority to do so, does

6   something which is usually done in connection with the

7   transactions he is employed to conduct."

8

9   There was no proof that TSI "usually" engaged in the

10  sales of unregistered stock.

11

12  TSI, however, had an affirmative obligation to prevent

13  use of the prestige of its firm to defraud the

14  investing public.  When it agents are dealing

15  individually in the sale of securities TSI must be

16  clearly disassociated from those transaction, as

17  otherwise it will incur liability on the basis of

18  respondent superior for the fraudulent representations

19  of its agents.

20

21  [T]he district Judge correctly . . . held TSI liable in

22  those plaintiffs who were without knowledge of

23  limitations on the agent's authority.  _Id_. At 696.[1]

24  75.  Prudential is liable because they participated in,

25  _____

26  [1]  Henricksen v. Henricksen and Smith Barney, 640 F2d 880, 887 (7th Cir. 1980) ("Under
    common law principles, a principle is liable for the deceit of its agent committed in the very
27  business he was appointed to carry out.  This is true even though the latter's specific conduct was
    carried on wihtout knowledge of lthe principal.")
28

GS00066

aided and/or supervised all of the transactions heretofore
mentioned.  Prudential is also liable under agency principles and
the doctrine of *respondent superior* and controlling person for
the negligent actions and breaches of duty by Spicuzza while in
the scope of their employment, agency, and apparent agency with
Prudential.

.76.. As a direct and proximate result of Prudential's
failure to supervise Spicuzza's activities, Lockrem has been
damaged in an amount to be proven at arbitration, in addition to
interest at the maximum legal rate.

### EIGHTH CAUSE OF ACTION

#### (Negligence)

77.  The Lockrem Estate repeats and realleges paragraphs 1
through 76 as though set forth in full herein.

.78.  Respondents' violation of NASD rules constitutes
negligence.  As the Fifth Circuit observed in Miley v.
Oppenheimer & Co., Inc., 637 F.2d 318, 333 (5th Cir. 1981), the
NYSE and NASD rules are excellent tools against which to assess
in part the reasonableness or excessiveness of a broker's
handling of an investor's account," and the lower court properly
included a reference to those rules in its jury charge.  See
Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th
Cir. 1980) ("Appellants content that the admission of testimony
regarding the New York Stock Exchange and NASD rules served to
dignify those rules and regulations to some sort of standard.
The admission of testimony relating to those rules was proper
precisely because the rules reflect the standard to which all

-22-

GS00067

brokers are held."). <u>See</u> <u>also</u> <u>Dean Witter Reynolds, Inc. v.</u>

<u>Hammock</u>, 489 So. 2d 761, 767 ) (1986) ("Case law is clear that

evidence of violation of industry standards is admissible as non-

conclusive evidence of negligence"); <u>St. Louis-San Francisco R.R.</u>

<u>Co. v. White</u>, 369 So.2d 1007 (Fla. 1st D.C.A. 1979); <u>St. Louis-</u>

<u>San Francisco R.R. Co. v. Burlison</u>, 262 So.2d 280 (Fla. 1st

D.C.A. 1972); <u>Clements v. Boca Aviation, Inc.</u> 444 So.2d 597 (Fla.

4th D.C.A. 1984); <u>Nance v. Winn Dixie Stores, Inc.</u> 436 So.2d 1075

(Fla. 3rd D.C.A. 1983); <u>Reese v. Seaboard Coastline R.R. Co.</u>, 360

So.2d 27 (Fla. 4th D.C.A. 1978).

79.  As indicated above, respondents violated, among other

things, Rules 2310, 2510, 3010, 3030 and 3040 of the NASD <u>Conduct</u>

<u>Rules</u>.  These violations constitute prima facie evidence of

unreasonable handling of Lockrem's monies.

80.  Further, as indicated above, Prudential was negligent

for, among other things, failing to adequately supervise

Spicuzza.

81.  Prudential was further negligent in failing to inquire

as to the source of her investment funds although it knew, or

should have known, that Spicuzza did not earn anywhere near the

amount of money she invested and traded.

82.  As a direct and proximate result of the foregoing

conduct, Lockrem has been damaged in an amount to be proven at

arbitration, in addition to interest at the maximum legal rate.

///

///

GS00068

### NINTH CAUSE OF ACTION

#### (Injunctive Relief Against Spicuzza)

83.    The Lockrem Estate repeats and realleges paragraphs 1 through 82 as though set forth in full herein.

84.    Spicuzza's retention of Lockrem's remaining monies, unless and until enjoined by the NASD, will cause great and irreparable injury to Lockrem in that there is a great likelihood that Spicuzza will dissipate the funds.

85.    Lockrem has no adequate remedy at law for the injuries currently being suffered and which will be suffered as a direct and proximate result of Spicuzza's actions, as described above.

///

///

WHEREFORE, Lockrem's Estate prays for judgement against respondents as follows:

#### FIRST THROUGH FOURTH CAUSES OF ACTION

1.    Out of pocket damages in an amount to be proven at arbitration;

2.    Interest at the maximum legal rate; and

3.    Punitive damages;

#### FIFTH THROUGH EIGHTH CAUSES OF ACTION

4.    Out of pocket damages in an amount to be proven at arbitration; and

5.    Interest at the maximum legal rate;

GS00069

1

**NINTH AND ALL CAUSES OF ACTION**

2    6.   For preliminary and permanent injunctive relief

3  enjoining Spicuzza and her agents, servants, employees and those

4  persons acting in concert or participation with her, and each of

5  them, from engaging in or performing directly or indirectly any

6  and all of the following acts:

7         (a)  Transferring, changing, wasting, dissipating,

8  converting, concealing, or otherwise disposing of, in any manner,

9  all funds that Spicuzza received from Lockrem or that is in the

10  possession of Spicuzza;

11         (b)  Destroying, mutilating, concealing, transferring,

12  altering, or otherwise disposing of, in any manner, any books,

13  records, computer programs, computer files, computer printouts,

14  correspondence, memoranda, brochures, or any other documents of

15  any kind, pertaining in any manner to the funds that Spicuzza

16  received from Lockrem;

17         (c)  Transferring, assigning, selling, hypothecating,

18  or otherwise disposing of any securities, any notes, investment

19  contracts, or other securities or any real property or

20  encumbering any real property of Spicuzza.

21    7.   For preliminary and permanent injunctive relief placing

22  a freeze on all accounts at any bank, financial institution or

23  brokerage firm, all certificates of deposit or other funds or

24  assets, held in the name of, or for the benefit of, Spicuzza that

25  contain any or all of the funds that Spicuzza received from

26  Lockrem.

27    8.   For all of Lockrem's Estate's attorneys fees and costs

28

GS00070

1 of litigation incurred in or related to this action;

2      9.   For pre-judgment interest; and

3      10.  For such other and further relief as the Arbitration

4 Panel may deem just and proper.

6      **ON ALL CAUSES OF ACTION**

7      11.  For all of Lockrem's Estate's attorneys fees and costs

8 of litigation incurred in or related to this action;

9      12.  For pre-judgment interest; and

10     13.  For such other and further relief as the Arbitration

11 Panel may deem just and proper.

13 DATED: December 21, 2000          NASH & EDGERTON
                                     SAMUEL Y. EDGERTON, III

16                            By: _____
                                  Samuel Y. Edgerton, III
17                                Attorneys for Claimants
                                  Linda Arana, Executor of the
18                                Estate of her late father,
                                  Theodore Lockrem

GS00071

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles.  I declare that I am over the age of eighteen (18) and not a party to this action.  My business address is 2615 Pacific Coast Highway, Suite 322, Hermosa, California 90254.

    On December 11 , 2000, I served the following document described as:

**FIRST AMENDED STATEMENT OF CLAIM**

on the interested parties in this action by placing the true copies thereof enclosed in sealed envelopes as stated on the attached mailing list:

    Mr. Richard Berry
    Mr. Rick Agbay
    National Association of Securities Dealers, Inc.
    300 So. Grand Avenue, #1620
    Los Angeles, California 90071

    Gail Spicuzza-Zorn
    4064 Kaahumanu Place
    Princeville, HI 96722-3597

    Pruco Securities Corporation
    Legal Department
    751 Broad Street
    Newark, N.J.  07102-3777

    Prudential Securities Inc.
    Legal Department
    199 Water Street
    New York, NY 10292-0129

(X)    I deposited such envelope in the mail at Hermosa Beach, California.  The envelope was mailed with postage thereon fully prepaid.

( )    By Personal Service, I caused such envelope to be delivered by hand to David King, Esq. at the address listed above.

( )    By overnight courier, I caused the above-referenced document(s) to be delivered to an overnight courier service (Federal Express), for delivery to the above addressee(s).

( )    By facsimile machine I caused the above-referenced document(s) to be transmitted to the above-named person at the following telephone numbers above.

(X)    (STATE)  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

( )    (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

-27-

GS00072

1   EXECUTED this 21 day of December, 2000 at Hermosa Beach, California.

2

3   BRENDA MURPHY

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GS00073

1

PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the County of Los Angeles. I declare that I am over
the age of eighteen (18) and not a party to this action. My business address
is 2615 Pacific Coast Highway, Suite 322, Hermosa, California 90254.

4

5

On January _11_ , 2001, I served the following document described as:

6

**FIRST AMENDED PROOF OF SERVICE**

7

on the interested parties in this action by placing the true copies thereof
enclosed in sealed envelopes as stated on the attached mailing list:

8

9

Mr. Richard Berry
Mr. Rick Agbay
National Association of Securities Dealers, Inc.
300 So. Grand Avenue, #1620
Los Angeles, California 90071

10

11

12

Gail Spicuzza-Zorn
4064 Kaahumanu Place
Princeville, HI 96722-3597

13

14

Gail Spicuzza-Zorn
6712-A Shincke Road, N.E.
Olympia, Washington 98506

15

16

Pruco Securities Corporation
Legal Department
751 Broad Street
Newark, N.J. 07102-3777

17

18

Prudential Securities Inc.
Legal Department
199 Water Street
New York, NY 10292-0129

19

20

21

(X)    I deposited such envelope in the mail at Hermosa Beach, California. The
envelope was mailed with postage thereon fully prepaid.

22

23

( )    By Personal Service, I caused such envelope to be delivered by hand to
David King, Esq. at the address listed above.

24

( )    By overnight courier, I caused the above-referenced document(s) to be
delivered to an overnight courier service (Federal Express), for
delivery to the above addresse(s).

25

26

( )    By facsimile machine I caused the above-referenced document(s) to be
transmitted to the above-named person at the following telephone numbers
above.

27

28

(X)    (STATE)    I declare under penalty of perjury under the laws of the State

-27-

GS00074

of California that the above is true and correct.

( )   (FEDERAL) I declare that I am employed in the office of a member of the
bar of this court at whose direction the service was made.

EXECUTED this _11_ day of January, 2001 at Hermosa Beach, California.

BRENDA MURPHY

GS00075