RECEIVED
FEB 22 2001
NASD Arbitration Mediation

## DECLARATION OF GAIL SPICUZZA

1. My name is Gail Spicuzza, I am over the age of eighteen, and am competent to testify to all matters stated herein.

2. I am named as a respondent in the proceeding now filed with the National Association of Securities Dealers in which the Estate of Ted Lockrem (Linda Arana as Executrix) makes claims against Pruco Securities, Prudential Securities, Inc., and me for a variety of causes of action relating to my personal relationship with Ted Lockrem.

3. Other than managing my vacation rental home, at the time of these events I was a full time insurance agent for Prudential Insurance. I was initially Series 7 licensed in approximately 1990, but, prior to or since these events, never acted in the capacity of a stockbroker. At the time I met Mr. Lockrem, I had one year of life insurance and mutual fund sales experience with IDS Financial Services in 1990 and four years of the same with Prudential Insurance.

4. Ted Lockrem and I became close personal friends after the summer of 1996. At that time, I lived in my house in Kauai, Hawaii, and met Mr. Lockrem through Peggy and Joe Watson who had, supposedly, maintained a close personal relationship with Mr. Lockrem for a period of 35 years. At that time, Mr. Lockrem was seeking a place to retire.

5. After he left Kauai that summer, he returned to his home in Page, Arizona. While there, we maintained a friendly relationship over the telephone and by way of written correspondence. Through the personal telephone calls and letters, it became apparent that Mr. Lockrem wanted to move to Kauai, and I opened my home to him.

6. Around December of 1996, Mr. Lockrem decided to move to Kauai. Ted asked me if I would consider allowing him to live in my house. I thought it might be a good idea for him to spend a month in my home to see if it was a good choice for him before either of us made a permanent decision to live together in the same house.

7. By that time, by way of our communications, it had become apparent to me that Mr. Lockrem was falling in love with me. At that time, I had no romantic interest in Mr. Lockrem, although I deeply respected him, and viewed him as a close friend. He flew over to Kauai from Page, Arizona, in January of 1997 for a month's stay.

8. During his one month visit, we became emotionally very close; however, no romantic relationship developed. By that time, he was convinced he wanted to move to Kauai. During his visit, we made no express or implied agreement regarding any rental arrangement.

9. During the period of late January through March 1997, we maintained a constant level of communication by way of telephone and on a couple of occasions, through letters and cards.



EXHIBIT "5"

-1-

COPY

S 00080

10. Mr. Lockrem seemed very interested in providing financial support for me because he explained to me that he wanted to pay off my mortgage. It was a surprise to me that he actually made approximately $90,000 in direct payments directly to my mortgage company between February and June of 1997.

11. As time became closer for Mr. Lockrem to move to Kauai, I also shared with him my intention to learn how to do options trading by taking courses from Wade Cook Seminars. I told him I was opening up a personal account with Securities Service Network ("SSN") an NASD broker/dealer, upon Wade Cook's Seminars recommendation. Before Mr. Lockrem closed on his home, and before he left Page, Arizona, on his own volition he sent $2,000 to SSN. The account was solely in my name.

12. When he arrived in Kauai shortly thereafter, he brought a check for the proceeds from the sale of his house in excess of $100,000. He opened up a separate savings account at the Kauai Federal Credit Union, and (to my surprise) asked me to be the joint tenant with right of survivorship on that account. From that account, we reduced out $20,000 for my SSN brokerage account, which he thought was a good idea. I notified Pruco that I opened an account with SSN. Pruco Securities, Inc. did not object to my opening this account. I did not feel it was necessary to discuss the details of my personal life with Mr. Lockrem with Pruco management. Later with his approval, I withdrew $30,000 more and sent it to SSN upon SSN's request.

13. I understood any money that was in the KCFCU Savings account was jointly ours, until it was spent or withdrawn; we could use that money for any good purpose or personal use.

14. The relationship Mr. Lockrem and I shared from the time he decided to move into my home until he took his own life in October of 1997 was a close personal friendship. We were not sexually involved because I viewed him more as a father figure. I had no business relationships with him of any sort, and I provided no investment advice to him, for any purpose.

15. I was investing monies I believed were mine to invest, and I invested them as a customer of SSN in my own personal account. Neither Pruco Securities nor I ever received any investment related compensation from my SSN transaction; in fact, it turned out that the Wade Cook philosophy did not work, and neither did Securities Service Network's recommendations. Ultimately, substantial amounts of monies I invested in my Securities Service Network account were lost and I closed the account.

16. I was a registered representative of Pruco Securities, Inc. I did not maintain an account with or for Mr. Lockrem at Pruco Securities, Inc. He was never my customer in either of my capacities as an insurance agent, or mutual funds salesperson. I had no agreements with him express or implied that I would be acting as any kind of investment adviser with him, and, in fact, it was clearly understood that any monies I was investing were

S 00081

S 00082

as a neophyte to learn covered call writing from Wade Cook Seminars. Mr. Lockrem understood that, and approved of it.

 Signed on this 14th day of February_____, at Seattle, Washington, under penalties of perjury.

*Gail Spicuzza*
Gail Spicuzza