UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRUCO SECURITIES, CORPORATION, a New Jersey Corporation,<br><br>Plaintiff,<br><br>v.<br><br>LINDA ARANA, Executor of the Estate of Her Late Father, Theodore Lockrem, Deceased,<br><br>Defendant. | CV-01-02881 WMB (SHx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

The above-titled action was tried before the Court on March 5, 6, and 7, 2002. Having heard the testimony of the witnesses and reviewed the exhibits admitted into evidence, as well as considering all the papers and argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. This action involves a dispute between defendant Linda Arana ("Arana"), as executor of the estate of Theodore Lockrem ("Lockrem"), and plaintiffs Pruco Securities Corporation ("Pruco") and Gail Spicuzza ("Spicuzza") over whether the National Association of Securities Dealers, Inc. ("NASD") has subject matter jurisdiction

EXHIBIT "9"

S 00247

1  to resolve an underlying dispute between them and compel arbitration in The Estate of
2  Ted Lockrem v. Pruco Securities, Inc. et al., NASD-DR No. 00-02354.

3       2.   Pruco is a member of the National Association of Securities Dealers, Inc.
4  ("NASD"). Defendant Gail Spicuzza ("Spicuzza") was, at all relevant times, a registered
5  representative of Pruco and an "associated person" within the meaning of Rule 10301 of
6  the NASD Code of Arbitration Procedure.

7       3.   In late 1996, Lockrem, a retired widower, traveled to Kauai, Hawaii. On
8  this trip, he met Spicuzza through mutual acquaintances and a close friendship developed.
9  Lockrem eventually moved into Spicuzza's home in Kauai.

10      4.   On October 8, 1997, Lockrem committed suicide at Spicuzza's home, and
11 left a suicide note, which stated that: "[T]he straw that broke the camel's back is that the
12 woman who I'm in love with is unable to return the love that I have for her, and I fully
13 understand why."

14      5.   From January 1997 through July 1997, Lockrem paid $97,024.05 to G.E
15 Capital of Hawaii, Inc. towards Spicuzza's home mortgage.

16      6.   On July 18, 1997, soon after he moved to Kauai, Lockrem opened an
17 account at the Kauai Community Federal Credit Union ("Kauai Credit Union"). Lockrem
18 deposited an escrow check from the sale of his home in Arizona for $109,751 into the
19 account. Gail Spicuzza was named as a joint signatory on the account, which permitted
20 her to withdraw funds.

21      7.   The same day as opening the Kauai Credit Union account, Spicuzza and
22 Lockrem jointly withdrew $20,000 in travelers' checks, which Spicuzza used to invest in
23 stocks and options through the brokerage house Securities Services Network, where she
24 held an account with stockbroker Justin Jensen.

25      8.   Spicuzza also invested $14,500.00 of her own funds in said Securities
26 Services Network account.

27      9.   On July 22, 1997, $10,000 was withdrawn from the Kauai Credit Union
28

S 00248

1  account to pay Spicuzza's VISA bill.

2  10. On July 23, 1997, $10,000 was disbursed from the Kauai Credit Union
3  account to Spicuzza's account at B.B. Graham brokerage.

4  11. On July 28, 1997, $4,300.00 was wired out of the Kauai Credit Union
5  account to Ala Wai Yacht Brokerage.

6  12. On July 31, 1997, $30,000 was disbursed from the Kauai Credit Union
7  account to Spicuzza's account at Securities Services Network.

8  13. On August 13, 1997, $34,240.63 was transferred to Spicuzza's checking
9  account, which was then deposited into Spicuzza's accounts at E.D. & F. Mann
10 International, Inc. and Prudential Securities.

11 14. All together, Spicuzza invested $92,000 from the Kauai Credit Union
12 account in various stocks and options purchased and sold through Securities Services
13 Network, B.B. Graham & Co., E.D. & F. Mann International, Inc., and Prudential
14 Securities, Inc.

15 15. All of the investments at issue were made in Spicuzza's name alone,
16 through registered representatives of the other companies.

17 16. Lockrem kept a detailed record of all of the above transactions in a file
18 titled "KCFCU" on his personal computer. The file, which bore the heading "Kauai
19 Community Federal Credit Union Record of Deposits and Disbursements" included a
20 complete list of how much was invested at each brokerage, as well as a complete list of
21 personal expenses paid out of the account.

22 17. Spicuzza, Lockrem and Justin Jensen, a registered representative of
23 Securities Services Network, had a telephone conference regarding Spicuzza's account at
24 Securities Services Network. During this conversation, Spicuzza asked Jensen to explain
25 the investments to Lockrem

26 18. Sometime in July, August or September 1997, prior to Lockrem's death,
27 Spicuzza invited Peggy and Joe Watson to dinner at her house. Peggy Watson testified
28

- 3 -

S 00249

1  that Spicuzza invited her and her husband in order to discuss Spicuzza's investments of
2  Lockrem's funds in the stock market and to explain those investments to the Watsons.
3      19.  On October 8, 1997, the day of Lockrem's death by suicide, Spicuzza was
4  interviewed by two Kauai police officers.
5      20.  Spicuzza was first interviewed by Officer Daniel Finney of the Kauai
6  police, the assistant responding officer. The interview took place in Lockrem's bedroom,
7  located in Spicuzza's home, at 10:00 a.m on October 8, 1997. Spicuzza told Officer
8  Finney that she first met Lockrem through associates and Kauai residents Joe and Peggy
9  Watson, whom he was visiting at that time. She stated that Lockrem was considering
10 selling his home in Arizona and retiring to Kauai. She said that they kept in touch, and
11 when he sold his home and came out to Kauai he proposed just giving her the proceeds
12 from his home sale to pay off the mortgage to her house, and he would just live
13 downstairs. She said that she advised him that rather than do that and have nothing left,
14 he could live downstairs, she could invest the money for him in a number funds and
15 stocks that they could share, that he would get his money back and have a place to live,
16 and she would be able to pay off her mortgage. Spicuzza told Finney that this was the
17 arrangement under which they resided together.
18     21.  Finney testified that sometime in 2001, Spicuzza called him on the
19 telephone and expressed concern with the wording of the police report he filed. Spicuzza
20 was concerned that Finney thought she was someone who would take advantage of
21 someone like Lockrem. Spicuzza was also concerned that Officer Finney had misheard
22 her statements about the arrangement under which they lived together. Spicuzza did not
23 ask him to change the report but insisted that it was inaccurate.
24     22.  At 11:35 a.m. on October 8, 1997, Spicuzza was interviewed by Detective
25 Sheldon of the Kauai police department. Spicuzza told Sheldon that Lockrem visited
26 Kauai and revealed that he wanted to sell his property in Arizona and retire in Kauai. She
27 stated that he did return after selling his home in Arizona and that she accepted him living
28

1  to Spicuzza.

2  32. After Lockrem's death, Lockrem received a check by mail from the
3  National Bank of Arizona in the approximate amount of $2,100 made payable to him.
4  Spicuzza subsequently deposited the check into the Kauai Credit Union joint account.
5  After the check cleared, the funds were later transferred to her personal account.

6  33. The Kauai Credit Union sued Spicuzza in Small Claims Court and received
7  a default judgment in its favor against Spicuzza for $2,100.

8  34. Any Conclusion of Law deemed to be a Finding of Fact is hereby
9  incorporated into these Findings of Fact.

10

11                         CONCLUSIONS OF LAW

12  1. Any Finding of Fact deemed to be a Conclusion of Law is hereby
13  incorporated into these Conclusions of Law.

14  2. The Court has jurisdiction over the parties and over this action pursuant to
15  28 U.S.C. § 1332.

16  3. NASD Rule 10301(a) provides that "any dispute, claim, or controversy...
17  between a customer and a member and/or associated person arising in connection with the
18  business of such a member or in connection with the activities of such associated person
19  shall be arbitrated under this Code... upon demand of the customer."

20  4. It is well established that federal policy favors enforcing valid agreements
21  to arbitrate disputes. See Moses H. Cone Memorial Hospital v. Mercury Construction
22  Corp., 460 U.S. 1, 24 (1983); see also Shearson/American Express, Inc. v. McMahon, 482
23  U.S. 220, 226 (1987).

24  5. The Supreme Court has stated that "any doubts concerning the scope of
25  arbitrable issues should be resolved in favor of arbitration." Id. at 24–25.

26  6. Courts have broadly interpreted the meaning of a "customer" as defined
27  within the context of Rule 10301(a). Vestax Securities Corp. v. McWood, 116 F.
28

-6-

1  Supp.2d 865, 869 (E.D. Mich. 2000) (citing WMA Securities, Inc. v. Ruppert, 80 F.
2  Supp.2d 786, 789 (S.D. Ohio 1999) (citing Lehman Brothers, Inc. v. Certified Reporting
3  Co., 939 F. Supp. 1333, 1340 (N.D. Ill. 1995)).

4     7.   The term 'customer' refers to either the member's or the associated person's
5  customer. John Hancock Life v. Wilson, 254 F.3d 48, 58-59. (2nd Cir. 2001). See also
6  Vestax Securities Corp v. Skillman, 117 F. Supp.2d 654, 657 (N.D. Ohio 2000) (by
7  conducting business with plaintiff's registered representative, defendants conducted
8  business with plaintiff and became its customers).

9     8.   "No federal appellate court has prohibited the customer of an associated
10 person, asserting a claim arising out of the associated person's business, from compelling
11 a member to arbitrate under Rule 10301." John Hancock Life v. Wilson, 254 F.3d 48, 59
12 (2nd Cir. 2001). See also Vestax Secuirites Corp. v. McWood, 2202 FED App. 0057P (6th
13 Cir. February 14, 2002)("[A]an agent or representative of a financial services firm is an
14 "associated person" under NASD Rule 10301(a) such that a relationship with the agent
15 entitles the investor to the arbitration process.)

16    9.   The fact that the "customer" never opened accounts with the NASD-
17 member firm is irrelevant. Vestax Securities Corp v. Skillman, 117 F. Supp.2d 654, 657
18 (N.D. Ohio 2000)

19    10.   A customer includes individuals who maintained an "informal business
20 relationship with a representative of an NASD member." Vestax Securities Corp. v.
21 McWood, 116 F. Supp.2d 865, 869 (E.D. Mich. 2000) (citing WMA Securities, Inc. v.
22 Ruppert, 80 F. Supp.2d 786, 789 (S.D. Ohio 1999) (citing Lehman Brothers, Inc. v.
23 Certified Reporting Co., 939 F. Supp. 1333, 1340 (N.D. Ill. 1995)).

24    11.   The dispute between plaintiff Arana and defendants Pruco Securities and
25 Spicuzza arises in connection with Spicuzza's business activities.

26    12.   Lockrem was Spicuzza's "customer" within the meaning of NASD Rule
27 10301(a).

28

S 00252

13. Therefore, the underlying dispute is subject to binding arbitration before the NASD.

## JUDGMENT & ORDER

It is hereby ORDERED and ADJUDGED that the National Association of Securities Dealers, Inc. has subject matter jurisdiction to resolve the underlying dispute and compel arbitration between defendant Linda Arana, as executor of the estate of Theodore Lockrem, and plaintiffs Pruco Securities Corporation and Gail Spicuzza in the arbitration <u>The Estate of Ted Lockrem v. Pruco Securities, Inc. et al.</u>, NASD-DR No. 00-02354. The preliminary injunction imposed by this Court is lifted, and finally, plaintiff Pruco Securities shall bear defendant Linda Arana's costs pursuant to Federal Rule of Civil Procedure 54(d).

IT IS SO ORDERED.

Dated: __April 3__, 2002

_____
Wm. Matthew Byrne, Jr.
United States District Judge

S 00253